1
2
3
4
5
6
7
8                    UNITED STATES DISTRICT COURT

9                    CENTRAL DISTRICT OF CALIFORNIA

10

11  JOVANNY THEUS,                    Case No.  2:19-cv-08160-DOC-KES

12             Petitioner,
                                      FINAL REPORT AND
13       v.                           RECOMMENDATION OF U.S.
                                      MAGISTRATE JUDGE
14  WARREN L. MONTGOMERY,

15  Warden,

16             Respondent.

17

18

19       This Final Report and Recommendation ("R&R") is submitted to the

20  Honorable David O. Carter, United States District Judge, pursuant to the provisions

21  of 28 U.S.C. § 636 and General Order 05-07 of the United States District Court for

22  the Central District of California.

23                              I.

24                        INTRODUCTION

25       Jovanny Theus ("Petitioner") challenges his state court convictions for

26  robbery, kidnapping, and sex crimes.  The Magistrate Judge dismissed the initial

27  petition ("Petition" at Dkt. 1) with leave to amend, noting that it was improperly

28

                                1

filed under § 2241 rather than § 2254 and appeared to be untimely.  (Dkt. 5.)
Petitioner filed a First Amended Petition ("FAP" at Dkt. 6), which fails to cure the
timeliness problem.  Although Petitioner attempts to invoke the "actual innocence"
exception to the time bar, he fails to adequately explain the basis of this claim.
Accordingly, the FAP and this action should be dismissed as untimely.

On October 31, 2019, the undersigned Magistrate Judge issued an initial
R&R finding that the Petition should be dismissed as untimely.  (Dkt. 10.)
Petitioner filed timely objections to that R&R.  (Dkt. 12 ["Objs."].)[1]  The present
Final R&R is issued to explain why Petitioner's objections do not change the
Magistrate Judge's recommendation.

## II.

## PROCEDURAL HISTORY[2]

**A.    State Court Proceedings**

**1.    Conviction and Evidence Presented at Trial**

Petitioner "was convicted of second degree robbery, attempted first degree
robbery, three counts of kidnapping, and 10 counts of forcible sex crimes.  The jury
also found true aggravated kidnapping allegations, and prior serious felony
allegations were found true following a court trial."  People v. Jovanny, No.
B207665, 2009 Cal. App. Unpub. LEXIS 3027, at *1 (Apr. 20, 2009).[3]

The California Court of Appeal summarized the evidence presented at trial as
follows:

_____

[1] Although a second, untimely set of objections was docketed on December 4, 2019
(Dkt. 13), this appears to be an identical copy of the earlier-submitted objections.

[2] The facts in this section are taken from the Petition, the FAP, and the state court
records.  The Court takes judicial notice of the latter.  See Fed. R. Evid. 201(b)(2);
Harris v. Cty. of Orange, 682 F.3d 1126, 1132 (9th Cir. 2012).

[3] It appears that, in Petitioner's first appeal, his first and last names were switched
in the name of the case.

2

At around 7:00 p.m. on February 21, 2006, Emily R. attempted to park in her friend Elinor's assigned parking space, across the street from Elinor's apartment in West Hollywood. Emily drove over the curb, the bottom of her car hit the ground, and her car became stuck, with one wheel hanging over the curb. Emily called Elinor and told her about the problem. Elinor and her boyfriend Matt went out to the car and waited with Emily while she called for a tow truck. The tow truck driver looked at the problem and left to get additional equipment. He said he would call Emily when he returned. Emily, Elinor and Matt walked to a nearby restaurant where they ordered food and drinks.

Soon after they were served, Emily received a call from the tow truck driver. She told Elinor and Matt she would be right back, and walked to her car. The tow truck driver dislodged Emily's car and departed. Emily drove her car to a space on the street. During that time, she spoke to Elinor on the phone and told her she would return to the restaurant. She never did.

As Emily was walking from her car toward the restaurant, she heard fast footsteps and male voices behind her. She was grabbed from behind with one hand over her mouth and another one around her waist. A voice said, "'Okay. This is a robbery. We just want your money. We're not going to hurt you.'" The man who was holding Emily, later identified as Denson Henderson, dragged her across the street to a darker area. At that point, Emily noticed a second man, later identified as [Petitioner], who took her purse and rummaged through it. The men asked her how much money she had in the bank, and she told them she did not have very much money. They took her back to her car. [Petitioner] unlocked the car with her keys. Henderson put her in the back seat and got in next to her. [Petitioner] got into the driver's seat. The men asked Emily about each of her credit cards. Then they told her they were going to take her to a bank.

Henderson forced Emily's head into his lap as [Petitioner] drove the car. She saw a knife in Henderson's right hand. The car stopped on the street near a

*Bank of America. Henderson dragged Emily out of the car and around the building to the ATM machines. He handed her debit card to her and told her to withdraw $600. She tried, but was not successful. Then he told her to "'[t]ry 500.'" Again she tried, but did not succeed. He had her try to withdraw $400, and that failed. Finally he said, "'Let's just go. I'm going to take you to another bank somewhere else. Let's just go.'" Henderson started to drag Emily back toward the car. She grabbed a bench to try to stop him, and pretended to have an asthma attack. When he stopped, she tried to get away, but Henderson grabbed her again, shook her very hard, and continued dragging her to the car.*

*Emily was pushed back into the car, and Henderson told [Petitioner] that she had "'tried something funny.'" According to Emily, "He said something to that effect. 'If she does it again, show her the pistol and shoot her.'" [Petitioner] backed up and hit the car behind them. Henderson yelled at him, then forced Emily's head back into his lap. The car began moving, and Henderson forced Emily to orally copulate him. Then he forced her to change positions and he stuck his fingers inside her vagina. Emily noticed Henderson was wearing a hooded sweatshirt that said, "Phat Farm." He forced her to orally copulate him again.*

*At some point, the car stopped. Henderson covered Emily's head with something and led her out of the car into a room. He pushed her onto a bed, and uncovered her head. He told Emily to take off all her clothes, that they would be back for her, and "'Because you can't pay us in money, we want you to pay us in other ways.'" Emily did as she was told, the two men returned, and she was forced to perform numerous sex acts on them. After awhile, the men left the room and returned with a disposable camera. One of them put masking tape over Emily's eyes and she was forced into various positions while Henderson took photographs of her. During this time, one of the men inserted a heavy, cone-shaped object into her vagina. Then that was removed and something that felt like a soda or beer can was inserted part way into her vagina, and a picture was taken.*

4

One of the men handed Emily a piece of paper and a pencil, and told her to write down her full name, social security number, address, and PIN number for her bank. She did, and then she was left alone in the room with [Petitioner]. The film "Titanic" was playing on the video recorder at that time. While she was alone with [Petitioner], he talked to her about his life, and then forced her to engage in oral copulation and sexual intercourse. Emily did not try to escape because she heard voices outside the door and did not know who was out there.

Just after midnight, a woman later identified as Henderson's girlfriend, Nakeya Whitman, used Emily's debit card and her PIN number at a Citibank ATM in Inglewood. She placed an empty deposit envelope in the ATM and purportedly deposited $ 2,000 into the account. She then attempted to withdraw money from Emily's account. A few minutes later, Whitman unsuccessfully attempted to withdraw funds from Emily's bank account at a Bank of America ATM at 57th Street and Crenshaw Avenue. Both transactions were captured on security videos.

At some point, Henderson returned to the room holding a gun. He brought it over to Emily and said, "'This is the gun that we would use on you' or 'would have used on you if you tried anything, you tried to get away again' or something to that effect."

Henderson told Emily they owed someone a significant amount of money. He also said that someone who claimed to know her said she had "'a great deal of money, and we think that you're lying to us about how much money you actually have.'" Emily said she did not have money. [Petitioner] said he knew someone who would pay money to have her as a "'slave of prostitution'" and that another option would be for her to get money from someone she knew.

[Petitioner]then indicated he did not want to keep her against her will any longer, he wanted her to stay with them by choice and that he wanted her to be his girlfriend. Emily believed he was ready to let her go and get the money for them . She suggested it would be best if they released her back to her family. She

*promised she would find the money for them and that she would not tell the police.*

*Henderson handed Emily her cell phone and told her to call someone. She was warned not to let on that she had been kidnapped or assaulted. She called her sister, told her she had gambled and lost a lot of money at a casino in Sherman Oaks, and that she needed $6,000. She tried to communicate that she was actually in much more trouble than that. A deputy sheriff got on the telephone on her sister's end, and Emily asked him for $6,000 to get her out of her problem. Henderson took the phone away from Emily and ended the call. The men continued to press Emily for money. She called her mother, but there was no answer. She told the men she would not be able to get money until the banks opened at 9:00 a.m.*

*Henderson told Emily if they released her, they would keep her telephone and she would have to call every two hours. He warned that someone would follow her to make sure she did not go to the police, and reminded her that they knew where she lived. He also said he would make sure she was killed if she did not come up with the money and went to the police. Henderson said he would have to consult with someone else to "'see what he thinks about this, the situation that we're in.'" He left the room, and Emily begged [Petitioner] to let her go. [Petitioner] told her he would make sure she got out alive, but also told her Henderson is crazy and would easily shoot her and [Petitioner].*

*Henderson returned, and [Petitioner]left the room. Henderson forced Emily to orally copulate him again. Then he grabbed her and put her into the front passenger seat of her car, and put her head down on the console between the seats. [Petitioner] was in the driver's seat. Henderson left, and [Petitioner] began driving. Emily heard her cell phone ring. [Petitioner] told her to answer it, and instructed her to tell whoever it was that she was on her way home. Emily answered a call from her friend, and then one from her sister. Her sister told her to go to Santa Monica and San Vicente.*

*[Petitioner] drove Emily to an entrance to the 405 Freeway. He asked her if*

she would be able to find her way home from there. She said yes. He took her face in his hands, kissed her and said goodbye. She thanked him for letting her go. [Petitioner] got out of the car, Emily moved over to the driver's side, locked the doors, and drove off. She got on and off the freeway several times, hoping that if anyone was following her, she would lose them.

Eventually Emily arrived at a 7-Eleven store at Santa Monica and San Vicente. She told some workers outside the store that she had been kidnapped and raped and needed help. She was led inside where she used the telephone to call her sister.

A police officer picked Emily up and brought her to the police station. Her sister and her friend Elinor were there. Emily was interviewed by detectives, then taken to a rape treatment center, where she was interviewed and examined. DNA recovered from Emily's genitalia matched [Petitioner's] profile. DNA recovered from Emily's tank top matched Henderson's profile.

On March 5, 2006, Los Angeles County Sherriff's Deputies stopped a vehicle driven by Henderson in West Hollywood. [Petitioner] and two other men were passengers in the vehicle. During a search of the vehicle, deputies found a Tech-9 submachine gun inside the air filter box in the engine compartment. The magazine had bullets inside, but was not inserted inside the gun.

On March 16, 2006, Emily was shown photographic six-packs from which she identified pictures of Henderson and [Petitioner]. Two days later, a search was conducted of a house and detached garage converted to living quarters on West 53rd Street. A videotape of "Titanic" and a "Phat Farm" sweatshirt were recovered. Documents belonging to Nakeya Whitman and a letter addressed to Henderson, in care of Whitman, were found in the house.

Sheriff's deputies then went to Whitman's house. She answered the door, and Detective John Hanson recognized her as the person in surveillance videos from two ATM locations on the night of Emily's abduction. Whitman was asked if

*any of Henderson's belongings were in her residence. She directed police to a*
*black nylon jacket with a small knife in the pocket, an AK-47 magazine with several*
*live rounds, a red jacket with a fur collar similar to one seen in the ATM*
*surveillance videos, red Air Jordan tennis shoes, and some disposable cameras.*
*The detective also found a copy of the Beverly Press dated March 9, 2006. The*
*newspaper contained two composite sketches of Emily's captors. Whitman was*
*arrested.*

*[Petitioner]waived his rights and was questioned on March 18, 2006 at the*
*sheriff's station. He denied knowing anything about the victim or the crimes, and*
*claimed he was in Belize at the time of the incident. He admitted Henderson was his*
*best friend. Just before his arraignment a few days later, [Petitioner] saw*
*Detective Hanson and insisted on talking to him. [Petitioner] admitted*
*participating in Emily's abduction. He claimed it started as a purse snatching, that*
*Henderson changed plans, and that he went along because he was afraid of*
*Henderson. He denied participating in the sexual assaults.*

*[Petitioner] was charged with one count of second degree robbery, one count*
*of attempted first degree robbery, one count of kidnapping to commit carjacking,*
*one count of kidnapping to commit robbery, one count of kidnapping to commit a*
*sex crime, three counts of forcible rape in concert, three counts of forcible oral*
*copulation in concert, two counts of forcible sodomy in concert, and two counts of*
*forcible sexual penetration in concert. Aggravated kidnapping allegations were*
*attached to all forcible sex crime counts, and one prior felony strike and one prior*
*serious felony conviction also were alleged. Henderson faced similar charges. The*
*men were tried together, to separate juries.*

Jovanny, No. B207665, 2009 Cal. App. Unpub. LEXIS 3027, at *2-12.

Petitioner was sentenced and judgment was entered in April 2008. (FAP at 1
¶ 2 [alleging that Petitioner was sentenced on April 29, 2008]); see also California
Appellate Courts Case Information, Case No. B207665 (indicating that Petitioner

8

filed a notice of appeal on May 7, 2008).[4]

## 2. Direct Appeals

Petitioner appealed.  The California Court of Appeal affirmed his convictions but agreed with Petitioner's allegations of sentencing error.  Jovanny, No. B207665, 2009 Cal. App. Unpub. LEXIS 3027, at *31-43.  On April 20, 2009, the Court of Appeal issued an opinion ordering that the case be remanded for resentencing.  Id.

On May 21, 2009, Petitioner filed a petition for review in the California Supreme Court, which denied the petition on July 22, 2009.  See California Appellate Courts Case Information, Case No. S173091.

The case returned to the L.A. Superior Court, which resentenced Petitioner. He appealed his new sentence to the California Court of Appeal.  People v. Theus, No. B221074, 2011 Cal. App. Unpub. LEXIS 5432, at *2 (July 21, 2011).  The Court of Appeal again made a finding of sentencing error and, on July 21, 2011, ordered as follows:

> [Petitioner's] sentence on count 2 (kidnapping during the commission
> of a carjacking) is ordered stayed pursuant to section 654.  The
> superior court clerk shall prepare and forward to the Department of
> Corrections and Rehabilitation an amended abstract of judgment that
> reflects this change.  The minute order and abstract of judgment shall
> be amended to reflect that the sentence on the stayed count 5 is 19
> years to life.  The abstract of judgment shall also be amended to
> reflect that [Petitioner] was ordered to pay the victim restitution fund
> $26,184.27.  So modified, the judgment is affirmed.

---

[4] The dockets (and some opinions) of the California Courts of Appeal and the California Supreme Court are available at: https://appellatecases.courtinfo.ca.gov/index.cfm.

Id. at *14-15.

Petitioner filed a second petition for review in the California Supreme Court on August 23, 2011, and the petition was denied on September 28, 2011. See California Appellate Courts Case Information, Case No. S195815.

Petitioner did not file a petition for certiorari in the U.S. Supreme Court. (FAP at 3 ¶ 9(h).)

Proceedings were held in the L.A. Superior Court in Petitioner's case on August 9, 2011 and November 2, 2011. See People v. Theus, No. SA059682 (L.A. Sup. Ct.).[5]

### 3. State Habeas Proceedings

Petitioner filed his first habeas petition in the state courts in July 2016, when he filed a habeas petition in the L.A. County Superior Court. (FAP at 3-5.) The Superior Court denied the petition on October 20, 2016. (Id. at 3); see also Theus, No. SA059682 (L.A. Sup. Ct.) ("habeas corpus petition" docket entry dated Oct. 20, 2016).

On March 14, 2017, he filed a habeas petition in the California Court of Appeal, which was denied on July 27, 2017. (FAP at 4); California Appellate Courts Case Information, Case No. B281257.

On September 28, 2017, he filed a habeas petition in the California Supreme Court, which was denied on November 29, 2017. (FAP at 4-5); California Appellate Courts Case Information, Case No. S244656.

### B. Federal Proceedings

On September 14, 2019, Petitioner constructively[6] filed a document in this

---

[5] The criminal dockets of the L.A. County Superior Court are publicly available at: http://www.lacourt.org/criminalcasesummary/ui/.

[6] "Under the mailbox rule, a prisoner's pro se habeas petition is deemed filed when he hands it over to prison authorities for mailing to the relevant court." Campbell v. Henry, 614 F.3d 1056, 1058-59 (9th Cir. 2010) (citation omitted). A court generally deems a habeas petition filed on the day it is signed, because it assumes

Court captioned "Petition for Writ of Habeas Corpus by Person in *Federal* Custody, 28 U.S.C. § 2241." (Pet. at 1) (emphasis added). However, the Petition alleged that Petitioner was in state custody and challenged a conviction sustained in the Los Angeles County Superior Court. (Id. at 2.)

The Magistrate Judge screened the Petition pursuant to Rule 4 of the Rules Governing Section 2254 and 2255 Cases in the United States District Courts ("Habeas Rules")[7] and dismissed it with leave to amend. (Dkt. 5.) The Magistrate Judge noted that this action should be brought under 28 U.S.C. § 2254 and also noted that the Petition: (a) appeared to be untimely; (b) appeared to be relying on Schlup v. Delo, 513 U.S. 298 (1995) to overcome the time bar, but insufficiently explained the nature of the asserted actual innocence claim; (c) brought a non-cognizable Fourth Amendment claim; and (d) failed to sufficiently explain the basis for his claim that he received ineffective assistance of counsel at trial and on appeal.

Petitioner timely filed a First Amended Petition ("FAP" at Dkt. 6), which brings the following two claims:

Ground 1: "Petitioner was deprived of a fair trial under the state and federal due pr[ocess] clauses, in that [he] is factually innocent." (FAP at 5; see also id. at 11-12.)

Ground 2: "Petitioner was denied his 4th and 14th Amendment rights against unlawful search and seizure." (Id. at 7.)

---

the petitioner turned the petition over to prison authorities for mailing that day. Butler v. Long, 752 F.3d 1177, 1178 n.1 (9th Cir. 2014); Roberts v. Marshall, 627 F.3d 768, 770 n.1 (9th Cir. 2010). The Court assumes for purposes of this R&R that Petitioner is entitled to the benefit of this rule because, even if he is, it does not render this action timely.

[7] The Habeas Rules are available at: https://www.uscourts.gov/sites/default/files/rules-governing-section-2254-and-section-2255-proceedings.pdf.

**III.**

**DISCUSSION**

**A.  The Petition is Untimely.**

Habeas Rule 4 requires the district courts to "promptly examine" new habeas petitions and, "[i]f it plainly appears from the petition and any attached exhibits that the petitioner is not entitled to relief in the district court, the judge must dismiss the petition and direct the clerk to notify the petitioner."  In doing so, district courts are "permitted, but not obliged, to consider, <u>sua</u> <u>sponte</u>, the timeliness of a state prisoner's habeas petition."  <u>Day v. McDonough</u>, 547 U.S. 198, 209-10 (2006). Before acting on its own initiative, however, a court must accord the parties fair notice and an opportunity to present their positions."  <u>Id.</u>; <u>see</u> <u>also</u> <u>Nardi v. Stewart</u>, 354 F.3d 1134, 1141 (9th Cir. 2004) (holding that district court has authority to raise statute of limitations issue <u>sua</u> <u>sponte</u> when untimeliness is obvious on face of petition, and to summarily dismiss the petition on that ground pursuant to Habeas Rule 4, as long as the Court "provides the petitioner with adequate notice and an opportunity to respond").

**1.  Petitioner's conviction became final for AEDPA purposes in January 2011.**

This action is subject to the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA").  <u>Lindh v. Murphy</u>, 521 U.S. 320, 336 (1997) (holding that AEDPA applies to cases filed after its effective date of April 24, 1996).  AEDPA imposes a 1-year statute of limitation that runs from the latest of:

> **(A)** the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;
>
> **(B)** the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;

**(C)** the date on which the constitutional right asserted was initially
recognized by the Supreme Court, if the right has been newly
recognized by the Supreme Court and made retroactively applicable to
cases on collateral review; or

**(D)** the date on which the factual predicate of the claim or claims
presented could have been discovered through the exercise of due
diligence.

28 U.S.C. § 2244(d).

"[F]or purposes of determining the start of the one year statute of limitations for filing a habeas petition under 28 U.S.C. § 2244(d)(1), the relevant judgment is the one under which a prisoner is being held. … Where an amended or corrected judgment is entered, a prisoner is held under that amended or corrected judgment." Marquez v. McDaniel, 729 F. App'x 583, 584 (9th Cir. 2018) (citing Smith v. Williams, 871 F.3d 684, 688 (9th Cir. 2017)).  The amended judgment becomes final for AEDPA purposes after the time for filing a direct appeal expires.  See 28 U.S.C. § 2244(d)(1)(A); Heath v. Allison, No. 17-cv-2226, 2018 WL 4282630 at *6, 2018 U.S. Dist. LEXIS 153112 at *17-18 (S.D. Cal. Sept. 6, 2018) (collecting district court cases), R&R adopted, 2018 WL 4871175, 2018 U.S. Dist. LEXIS 173747 (S.D. Cal. Oct. 9, 2018).  In California, such time expires 60 days after entry of judgment.  Id.; Cal. R. Ct. 8.308(a) (providing that a notice of appeal in a criminal case must be filed within 60 days after the rendition of the judgment).

Following Petitioner's two successful appeals in the California Court of Appeal, an amended judgment was entered in Petitioner's case on, at the latest, November 2, 2011.  See Theus, No. B221074, 2011 Cal. App. Unpub. LEXIS 5432, at *14-15 (July 21, 2011 opinion of the California Court of Appeal ordering that the judgment be amended); California Appellate Courts Case Information, Case No. S195815 (Sept. 28, 2011 order denying second petition for review in the California Supreme Court); People v. Theus, No. SA059682 (L.A. Sup. Ct.) (docket indicating

1    that proceedings were held in the Superior Court on November 2, 2011).  His
2    conviction became final for purposes of the AEDPA statute of limitations on, at the
3    latest, January 2, 2012 (sixty days later).

4        **2.    Petitioner is not entitled to statutory tolling.**

5          The AEDPA one-year deadline is tolled for the "time during which a
6    properly filed application for State post-conviction or other collateral review with
7    respect to the pertinent judgment or claim is pending…."  28 U.S.C. § 2244(d)(2).
8    The United States Supreme Court has interpreted this language to mean that
9    AEDPA's statute of limitations is tolled from the time the first state habeas petition
10   is filed until the California Supreme Court rejects a petitioner's final collateral
11   challenge, so long as the petitioner has not unreasonably delayed during the gaps
12   between sequential filings.  Carey v. Saffold, 536 U.S. 214, 219-21 (2002); Nino v.
13   Galaza, 183 F.3d 1003, 1006 (9th Cir.), cert. denied, 529 U.S. 1104 (2000).
14   However, statutory tolling "does not permit the reinitiation of a limitations period
15   that has ended before the state petition was filed," even if the state petition was
16   timely filed under state law.  Ferguson v. Palmateer, 321 F.3d 820, 823 (9th Cir.),
17   cert. denied, 540 U.S. 924 (2003); Jimenez v. Rice, 276 F.3d 478, 482 (9th Cir.
18   2001); Wixom v. Washington, 264 F.3d 894, 898-99 (9th Cir. 2001), cert. denied,
19   534 U.S. 1143 (2002).  The burden of demonstrating that the AEDPA's one-year
20   limitation period was sufficiently tolled rests with the petitioner.  See, e.g., Pace,
21   544 U.S. at 418; Banjo v. Ayers, 614 F.3d 964, 967 (9th Cir. 2010); Gaston v.
22   Palmer, 417 F.3d 1030, 1034 (9th Cir. 2005) (as amended); Miranda v. Castro, 292
23   F.3d 1063, 1065 (9th Cir. 2002).

24         As noted above, Petitioner did not file any habeas petitions in the state courts
25   until 2016.  Petitioner is not entitled to statutory tolling for any of these petitions
26   because they were filed years after the one-year statute of limitations had already
27   expired on (at the latest) January 2, 2011.  See Ferguson, 321 F.3d at 823 (9th Cir.
28   2003) (statutory tolling "does not permit the reinitiation of a limitations period that

has ended before the state petition was filed," even if the state petition was timely filed under state law).

### 3.  Petitioner is not entitled to equitable tolling.

AEDPA's one-year limitation period is subject to equitable tolling if the petitioner shows both that (1) he has been pursuing his rights diligently, and (2) some "extraordinary circumstance" stood in his way and prevented his timely filing.  Holland v. Florida, 560 U.S. 631, 649 (2010) (quoting Pace v. DiGuglielmo, 544 U.S. 408, 418 (2005)).  "[T]he threshold necessary to trigger equitable tolling [under AEDPA] is very high, lest the exceptions swallow the rule."  Miranda v. Castro, 292 F.3d 1063, 1066 (9th Cir.), cert. denied, 537 U.S. 1003 (2002).  Consequently, equitable tolling will be justified in few cases.  Spitsyn v. Moore, 345 F.3d 796, 799 (9th Cir. 2003).  "To apply the doctrine in 'extraordinary circumstances' necessarily suggests the doctrine's rarity, and the requirement that extraordinary circumstances 'stood in his way' suggests that an external force must cause the untimeliness, rather than, as we have said, merely 'oversight, miscalculation or negligence on [the petitioner's] part, all of which would preclude the application of equitable tolling.'"  Waldron-Ramsey v. Pacholke, 556 F.3d 1008, 1011 (9th Cir. 2009).  Again, the burden of demonstrating that the AEDPA's one-year limitation period was tolled, whether statutorily or equitably, rests with the petitioner.  See, e.g., Pace, 544 U.S. at 418; Banjo, 614 F.3d at 967; Gaston, 417 F.3d at 1034; Miranda, 292 F.3d at 1065.

Neither the initial Petition nor the FAP allege any facts that might justify equitable tolling of the statute of limitations.

### B.  Petitioner Has Not Alleged a Sufficient Actual Innocence Claim.

### 1.  Legal Standard

It appears that Petitioner may be attempting to rely on Schlup v. Delo, 513 U.S. 298 (1995) to excuse the untimeliness of this action.  (See FAP at 11.)  Under Schlup, "a credible claim of actual innocence constitutes an equitable exception to

15

AEDPA's limitations period, and a petitioner who makes such a showing may pass through the Schlup gateway and have his otherwise time-barred claims heard on the merits." Lee v. Lampert, 653 F.3d 929, 932 (9th Cir. 2011). However, "[i]n order to present otherwise time-barred claims to a federal habeas court under Schlup, a petitioner must produce sufficient proof of his actual innocence to bring him within the narrow class of cases … implicating a fundamental miscarriage of justice." Id. at 937 (internal quotation marks and citations omitted). While a petitioner is not required to proffer evidence creating an "absolute certainty" about his innocence, the Schlup gateway is an "exacting standard" that permits review only in the "extraordinary case." Id. at 938; see also House v. Bell, 547 U.S. 518, 538 (2006) ("[I]t bears repeating that the Schlup standard is demanding and permits review only in the 'extraordinary' case.").

Specifically, a petitioner must show "that it is more likely than not that no reasonable juror would have convicted him in light of the new evidence." Lee, 653 F.3d at 938 (quoting Schlup, 513 U.S. at 327). The petitioner must support his allegations "with new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—*that was not presented at trial*." Lee, 653 F.3d at 938 (quoting Schlup, 513 U.S. at 324; emphasis added).

**2.    Discussion**

a.    Challenges to Evidence Presented at Trial

The FAP alleges in relevant part:

Petitioner's claim of clear and convincing evidence of his actual

innocence, requires reversal of his 2006 convictions under the …

Schlup -v- Delo probability standard on proof for actual innocence

claim, in that [the victim] gave false and[/]or misleading testimony

against the Petitioner[;] that the People's expert witness gave

corroborating testimony that support the Petitioner's testimony of his

16

actual innocence, in that his and [the victim's] sexual encounter was

consensual[;] and that but for the trial court's denial of Petitioner's

severance motion from his co-defendant, Petitioner would probably

have been found not guilty.

(FAP at 11.)  The FAP also alleges that the opinion of the state's medical examiner

was consistent with consensual sex and inconsistent with the victim's testimony

that a "large size hard foreign [object] penetrated her genital and anal area …

caus[ing] her great pain and discomfort."  (Id. at 10.)

Petitioner's Objections argue that: (a) the victim's identification of Petitioner

was not reliable because she testified that "her head was down in the car" and "she

was blind folded during certain sex acts"; and (b) "there was no kidnapping and

carjacking" because "[n]othing was taken from [the victim], not even her car."

(Objs. at 3.)

All of these allegations rely solely on evidence that was introduced at trial.

An argument that the evidence at trial was insufficient to convict Petitioner of the

crimes charged is not an actual innocence claim under Schlup.  See House v. Bell,

547 U.S. 518, 538 (2006) ("[T]he gateway actual-innocence standard is 'by no

means equivalent to the standard of Jackson v. Virginia, 443 U.S. 307 (1979),'

which governs claims of insufficient evidence.") (parallel citations omitted); see

also Bousley v. United States, 523 U.S. 614, 623 (1998) ("It is important to note in

this regard that 'actual innocence' means factual innocence, not mere legal

insufficiency.").

b.     Argument Relying on Supplemental Police Report

Petitioner does cite some evidence that he says was not introduced at trial.

He alleges that, in or around April 2019, he received a Los Angeles County Sheriff

Supplemental Investigative Report from his counsel.  (FAP at 10; Objs. at 3.)[8]  He

---

[8] The initial R&R pointed out that Petitioner had not explained how or from where
he received this report.  (Dkt. 10 at 17.)  See Schlup, 513 U.S. at 332 ("the court

attaches a copy two supplementary reports to the FAP. (FAP at 18-20, 22.)[9]

The first supplementary report appears to have been written by a Detective Vivian May. (Id. at 19, 22.) It states that, on March 5, 2006, she and another detective were assigned to the case and interviewed two suspects detained at the West Hollywood station jail. (Id.) The names of these suspects are redacted. (Id.) They identified Henderson as the driver of the car and said they had gone to the Hollywood area to "party." (Id.) The detectives tried to speak with Henderson, but he refused. (Id. at 22.)

The second supplementary report appears to have been written by Detective John Hanson. (Id. at 20.) It states that, on March 16, 2006, Detective Hanson met with the victim and showed her two photo lineups. "[T]he first photographic line-up contain[ed] a photo of suspect Henderson (in the #2 position)," and she "quickly identified" him. (Id.) "The second photographic line-up contain[ed] a photo of [Petitioner] (in the #1 position)," and she again "quickly identified" him. (Id.) Regarding Petitioner, she noted that she recognized his jaw and lips. (Id.)

Petitioner makes various arguments about the materiality of these reports in his initial Petition, the FAP, and his Objections. First, Petitioner argues that he

_____

may consider how the timing of the submission and the likely credibility of the affiants bear on the probable reliability of that evidence"). Although the Objections state that "Petitioner has now explained how and when he received the Confidential Sheriff Investigative Report" (Objs. at 3), that explanation remains unclear. It appears that Petitioner received the report from his trial counsel after he requested his case file. (See id. at 2 [stating that Petitioner wrote to his trial counsel requesting his case file in January 2019 and received a response in July or August 2019].) Although Petitioner attaches a copy of the letter that he wrote to his trial counsel to his Objections (id. at 7-10), he does not attach counsel's response.

[9] The FAP also attaches the second page of another report (without the first page), which describes Petitioner's arrest and searches of Henderson's and his girlfriend's residences. (FAP at 21.) This describes evidence that was introduced at trial. See Jovanny, No. B207665, 2009 Cal. App. Unpub. LEXIS 3027, at *2-12.

"discovered through his attorney that the victim … provided the police and[/]or detective with a statement that identifies [Petitioner] as looking like suspect #2's sketch when [Petitioner] was suspect #1 in the police line up sketch." (Pet. at 6.) However, the report states that, during a photo lineup, the victim identified the photo of Petitioner in the #1 position. It appears that Petitioner may have been confusing the second lineup, which included his photo, with the separate lineup that included Henderson's photo. After the Court pointed this out to Petitioner (Dkt. 5 at 2 n.2), he responded that, because he "doesn't know or cannot understand how the … report has him identified as being suspect number 1 … [i]t appears that the sheriff lied." (Objs. at 3.) This kind of conclusory allegation is insufficient to establish a viable actual innocence claim under <u>Schlup</u>.

Second, Petitioner argues that these reports "depict[] contradictions and[/]or misidentifications being made by [the victim] as to how she was in fact allegedly mistreated and[/]or her ability to adequately recollect the events surrounding the night she and the Petitioner met[,] let alone how she was being treated during her sexual encounter with the Petitioner [as] opposed to Petitioner's co-defendant Mr. Henderson." (FAP at 10.) The prior R&R found that this failed to adequately explain how the supplementary reports undermined the evidence introduced at trial. (Dkt. 10 at 17-18.) The Objections do not clarify Petitioner's argument. (Objs. at 3.)

Even assuming these reports are indeed "new evidence" within the meaning of <u>Schlup</u>, Petitioner has not sufficiently explained how they undermine the evidence presented at trial, such that no reasonable juror would have convicted him.

### c. Request for Trial Transcripts.

In his Objections, Petitioner argues that he "should be provided with a copy of the Clerk and Reporter's Transcript" because without them he is "unable to prove where … in the Reporter's Transcripts [the victim] was not being truthful to Petitioner's prejudice." (Objs. at 3.)

A state prisoner does not have a constitutional right to a trial transcript to assist him in preparation of a federal collateral attack on his conviction.  See United States v. MacCollom, 426 U.S. 317, 323-328 (1976).  Although the court *may* provide copies under 28 U.S.C. § 2250, "the question of what copies, if any, should be provided to an indigent habeas petitioner rests within the Court's discretion," and "[t]he litigant seeking copies must provide sufficient information to enable the Court to determine the necessity for the copies requested."  Van Wyk v. Beard, No. 15-01257-BRO-KES, 2016 U.S. Dist. LEXIS 76803 at *36, 2016 WL 3381283 at *14 (C.D. Cal. Mar. 14, 2016); see also Chessman v. Teets, 239 F.2d 205, 214 (9th Cir. 1956) ("What, if any, certified copies should be supplied [under § 2250] rests within the second discretion of the judge."), vacated on other grounds, 354 U.S. 156 (1957).  Thus, the "touchstones of an indigent's motion for a transcript are need and relevance."  U. S. ex rel. Williams v. State of Del., 427 F. Supp. 72, 76 (D. Del. 1976).

Here, Petitioner has shown neither need nor relevance.  Even if he is unable to point the Court to the precise page or line of the victim's testimony he wishes to challenge without the transcripts, he must be able articulate a general theory of relevance.  As discussed above regarding his actual innocence claim, he has failed to do so.  His request for transcripts should therefore be denied.

//
//
//
//
//
//
//
//
//

**IV.**

**RECOMMENDATION**

IT IS THEREFORE RECOMMENDED that the District Court issue an Order: (1) approving and accepting this Final R&R; (2) denying Petitioner's request for transcripts, and (3) dismissing the First Amended Petition and this action as untimely.

DATED: <u>January 16, 2020</u>

<u>Karen E. Scott</u>
KAREN E. SCOTT
United States Magistrate Judge